THE HERRING-CURTISS COMPANY, Appellant, v. GLENN H. CURTISS and Others, Respondents.*

Fourth Department, March 14, 1928.

Corporations — directors — official misconduct — action by corporation against former directors based on alleged breach of fiduciary duties — evidence shows breach of duties — said directors constituting majority of board are liable for misappropriation of corporate funds — former action by stockholder prior to bankruptcy of corporation was abandoned — plaintiff has right to maintain this action.

This is an action in equity by a corporation against certain former directors and is based upon alleged breach by them of their fiduciary duties. In 1909 the defendant Curtiss, an aviator, owned a small manufacturing plant at Hammondsport, N. Y. He and a man by the name of Herring entered into an agreement to organize a corporation to manufacture and sell motorcycles and aeroplanes and motors for both. In the carrying out of that agreement Herring paid Curtiss $45,000 in cash for his plant and gave him a mortgage for $15,000. The plaintiff corporation was organized and the entire stock, with the exception of a few shares issued to incorporators, was issued to Herring who turned over to the plaintiff corporation the property he had purchased from Curtiss. Others interested themselves in the corporation and furnished some money but neither Curtiss nor Herring invested any large amount in the plaintiff. Herring transferred a part of the shares to Curtiss and others but retained in his own name a controlling interest in the corporation. The first board of directors was controlled by Curtiss through his counsel and another. Curtiss entered into an agreement to devote all of his time to the corporation at a salary of $5,000 a year and Herring for a like salary agreed to devote two-thirds of his time. Curtiss apparently was unable to consider the corporation other than as his own property which was evidenced by the fact that shortly after the corporation was formed he delivered an aeroplane, the contract price of which was $5,000 and accepted in payment therefor $4,500 without authority, which he did not turn over to the corporation but deposited to his own account. A short time thereafter he caused $3,000 to be credited on the books of the plaintiff by his wife as for a machine sold to him personally. At the time the corporation was formed Curtiss had in his possession $3,000 paid to him as deposits by certain customers which he did not turn over to the corporation. Curtiss went to Europe where he entered prize contests and won large prizes which he failed to turn over to the corporation.

In the fall of 1909 it became apparent to Curtiss that the exhibition part of plaintiff's business would be very profitable and on October 23, 1909, he entered into a written contract with a third person whereby said third person agreed to manage the interests of Curtiss as an exhibition flyer. On October 25, 1909, the Curtiss-controlled board of directors passed a resolution in which he was authorized to retain all prize money, medals and trophies which he had theretofore received while working for the plaintiff and by which he was given authority to conduct the exhibition business of the plaintiff in his own name and receive and retain for himself all moneys and prizes taken. The exhibition business was then developing very rapidly and shortly after the resolution was

* Modifying 120 Misc. 733.

passed Curtiss, without authority and upon advice of his counsel, a codirector, had prepared a sales contract which provided that a purchaser of an aeroplane could not use the same for public flights intended for amusement or advertising purposes or for any flight previously advertised or in contests or races.

While Curtiss was in Europe an action was brought against the plaintiff and against Curtiss individually for a violation of a patent and in that action a temporary injunction was granted. Curtiss thought it advisable to raise $10,000, to deposit with the surety company which had put up a bond on the appeal from the order granting the temporary injunction, and he was authorized by a resolution of the board of directors to sell three aeroplanes at the best prices obtainable and to apply the proceeds thereof up to $10,000 as a deposit. Curtiss secretly and acting through a third person purchased the three aeroplanes himself on a contract which did not contain the restrictive covenants and at a price of $10,000 for the three machines which price, to say the least, was very low.

Shortly after the organization of the corporation friction arose between Herring and Curtiss and from then on there was a struggle between the two men for the control of the corporation. Curtiss had the temporary control through the board of directors, but Herring held the stock control which would become effective at the first stockholders' meeting for the election of directors. A short time before the election of directors Curtiss had the corporation institute an action against Herring to rescind the issuance of stock to Herring on the ground that he had not complied with his contract with reference to the transfer of his patents. A temporary injunction was granted which prevented Herring from transferring his stock and that was subsequently broadened to restrain Herring from voting his stock.

The facts summarized lead to the conclusion that the motives behind the resolution of October 25, 1909, were purely selfish on the part of Curtiss and his codirectors; that the resolution was unwarranted and caused loss and damage to the corporation, and that the adoption of the restrictive sales contract was in aid of the exhibition business which the directors had illegally transferred to Curtiss.

The contention by Curtiss that the resolution and the restrictive sales contract were for the purpose of protecting the plaintiff against the infringement action then pending has no merit whatever, for the evidence establishes that neither Curtiss nor his codirectors considered that infringement suit seriously. The resolution itself did not recite the infringement suit as a reason for its adoption and there is no evidence that it was discussed when the resolution was adopted. The answer by Curtiss and his codirectors in the present action did not attempt to justify the resolution on the ground that it was passed to protect the company against the infringement action and the resolution, in law, did not relieve the company from any liability.

The contention by Curtiss and his codirectors that he undertook at the time he took over the exhibition business to indemnify the plaintiff against any liability arising out of the infringement of patents is not sustained by the evidence.

It follows that the action of Curtiss and his codirectors in adopting the resolution was wrongful and illegal and a violation of their duties as directors and the same may be said of their act in adopting the restrictive sales contract.

As further evidence of the determination of Curtiss to gain control of the plaintiff without regard to his duties as a director it appears that in the summer of 1909 he caused the formation of a small corporation for the manufacture of motor-cycles and became a one-fourth owner thereof. Later he, as manager of the plaintiff, entered into a contract with this new corporation whereby the plaintiff

agreed to build and sell to the new corporation 500 motors at a price very much below their actual worth.

The result of the resolution of October 25, 1909, the restrictive sales contract and the contract for the sale of motors to the new corporation would have been, if Herring had obtained control of the corporation, to give him a corporation the principal part of whose business was in the hands of Curtiss and which was burdened with a contract for the sale of motors at a price below the cost of construction.

In November, 1909, a corporation, which had opened the corporate books at the time of the organization of the company, brought an action against the plaintiff to recover $500 for services rendered. Notwithstanding the plaintiff was then solvent and was able to pay that amount, the plaintiff in that action was deliberately permitted to take judgment. Upon return of an execution unsatisfied, a local bank and two small creditors filed a petition in bankruptcy against the plaintiff. Appraisers friendly to Curtiss and his codirectors made an inventory which on its face disclosed insolvency. After several months, during which the bankruptcy case was heard before a special master, the plaintiff was adjudicated a bankrupt and the receiver, who was friendly to Curtiss, was elected trustee. Prior to the institution of bankruptcy, Herring had commenced a stockholder's action based upon the acts of Curtiss and his codirectors which are alleged as the cause of action in this case. After bankruptcy the trustee was substituted without the order of the bankruptcy court to act as plaintiff in that action. The property of the corporation was ultimately sold in the bankruptcy proceedings to Curtiss. The final result is that Curtiss and his associates acquired possession of the assets of the plaintiff which were finally transferred to companies organized by them and in their control.

The evidence shows that the stockholder's action instituted by Herring in December, 1909, based on the fraudulent action of Curtiss and his codirectors in which the trustee was subsequently substituted as plaintiff was abandoned. Therefore, the plaintiff corporation has the right to maintain this action.

The judgment of the trial court dismissing the complaint as to all of the defendants is reversed so far as the defendant Curtiss and his codirectors are concerned and a reference is directed to fix the amount which the plaintiff is entitled to recover under the determination made by the Appellate Division.

APPEAL by the plaintiff from a judgment of the Supreme Court, entered in the office of the clerk of the county of Steuben on the 21st day of May, 1923, and also from two orders entered on the 21st day of May, 1923, and the 14th day of February, 1924, respectively.

*William J. Maloney* [*James M. E. O'Grady* of counsel], for the appellant.

*Robbins, Phillips, Greene & Robbins,* for the respondents Glenn H. Curtiss and others.

*Dominick & Dominick* [*John H. Dominick* of counsel], for Thomas A. Baldwin, as administrator, etc.

*James McCall,* for the respondent Gabriel H. Parkhurst, as trustee, etc.

*William V. L. Turnbull,* for the executors of defendant G. Ray Hall, deceased.

*Hornblower, Miller & Garrison,* for the respondent Cortlandt Field Bishop.

CROUCH, J. This is an action in equity by a corporation against certain former directors, based upon alleged breach by them of fiduciary duties. The defendants, other than the directors, are alleged to have been privy to the misdeeds of the directors, or to have profited thereby. The complaint demands an accounting of the diverted property and assets and of the profits resulting from the use thereof, with incidental damages. The trial resulted in a judgment dismissing the complaint of the plaintiff on the merits as to all of the defendants. The appeals here are from the judgment and from two orders, one of which changed *nunc pro tunc* the ruling of the trial court on a finding of fact, and the other granted an extra allowance of costs to the trustee in bankruptcy.

The director defendants originally named were Glenn H. Curtiss, Monroe Wheeler and Thomas S. Baldwin. The two latter have died since the commencement of the action, and their personal representatives have been substituted. The same is true of the defendant G. Ray Hall. The defendant Cortlandt Field Bishop, a stockholder in the plaintiff, by his answer united in plaintiff's charges and demands against his codefendants, whereupon the plaintiff withdrew its charges against him.

Early in the year 1909 the defendant Curtiss and a man named Augustus M. Herring formed a plan for organizing a corporation to manufacture and sell motorcycles and aeroplanes and motors for both. Curtiss was the owner of a manufacturing plant and doing business at Hammondsport, N. Y., known as the G. H. Curtiss Manufacturing Company. He had a practical knowledge of the art of aviation, so far as it had then been developed, together with skill and experience in actual flying. Herring was familiar with the theoretical side of the art, and owned certain inchoate inventions relating thereto which rested at the time in the form of applications. Apparently, however, he had no capital. The defendant Cortlandt Field Bishop, a man of means living in New York city, was interested generally in the development of the art, and was president of the Aero Club of America. Herring induced Bishop to assist in financing the new corporation. Broadly stated, Curtiss, under the plan adopted, first transferred to Herring the property and assets, including the good will of the G. H. Curtiss Manufacturing Company, together with certain real property, including the factory. Herring paid Curtiss $45,000 in cash and

gave back a mortgage for $15,000. The certificate of incorporation of the new company under the name The Herring-Curtiss Company — being the plaintiff in this action — was filed on March 19, 1909, and the first meeting for organization was held on March 20, 1909.

The capital stock consisted of $360,000, divided into 1,800 shares of preferred and 1,800 shares of common. Herring transferred to the company, subject to the $15,000 mortgage, all the property and assets derived from Curtiss and received in exchange 3,594 shares, being the entire capital stock except 6 shares in the names of the incorporators which had been issued for $600 in cash paid by Herring. The permanent directors became Monroe Wheeler, Glenn H. Curtiss, Augustus M. Herring, Thomas S. Baldwin and A. W. Gilbert. Wheeler was elected president and Curtiss and Herring vice-presidents. At the same time, and as part of the plan agreed upon, Curtiss entered into a contract with the company to act as an officer or employee for three years at $5,000 a year, agreeing to devote all of his time to its business and to assign to it all patents and inventions made by him during that period; and Herring entered into a similar contract for the same period and salary, agreeing to devote two-thirds of his time to the company's business and to assign to it his inventions, patents and applications. Herring, in accordance with his arrangement with Curtiss, transferred to Curtiss or to his order 683 shares of stock. To A. W. Gilbert he transferred 629 shares. Gilbert was in Bishop's employ and represented Bishop on the board of directors. Bishop, in accordance with his arrangement with Herring to assist in financing the company, had, with his brother David Bishop, advanced Herring $36,000. The 639 shares constituted payment for that advance. Herring also sold small lots of stock to other persons.

The result was that neither Herring nor Curtiss had any substantial amount of money invested in the company. Curtiss had received in cash or its equivalent his own price for his property and business. Nobody knew its value better than he did. The fact that an appraisal, made for the purposes of corporate organization and a heavy stock issue, exceeded that price by about $20,000, means little. His stock holding in the company was substantially a bonus. Herring, after selling such stock as he could, had invested in the company at most but a few thousand dollars plus his rather vague and inchoate patent rights. But he emerged with a controlling interest in the stock. The actual capital invested in the company was furnished almost entirely by the two Bishops and the smaller stockholders who had come in through Herring.

The corporation thus organized was in bankruptcy within a year; its creditors have never been paid in full; its stockholders — those who furnished the actual money — have realized nothing from their investment. Within two years of its organization, its business, tangible assets and good will were in the possession, not of Herring, who owned the controlling stock interest, not of the Bishops, who put up the actual capital, but of Directors Curtiss and Wheeler, or of corporations organized by them in which they and their friends, including Director Baldwin, were the principal stockholders.

We are to determine whether that devolution came about through acts of the director defendants for which they may be held legally liable in this action.

The record consists of an intricate web of testimony and exhibits occupying upwards of 7,000 printed pages, digested by counsel into upwards of 1,000 findings and argued by them in nearly 1,000 printed pages of briefs. Anything more than a broad outline of the facts with a statement of our conclusions is out of the question.

Herring, as has been stated, had a controlling interest in the stock. But Curtiss beyond question had the control of the board of directors. Wheeler, who was a prominent and influential citizen of Steuben county, had long been the personal friend and legal adviser of Curtiss. Baldwin had been associated in business matters for a long time with Curtiss and, according to Curtiss, knew more about the business than any one except himself. Here were three of the five directors, one of them the president and one a vice-president and actual manager, all living or spending their time in the vicinity of Hammondsport where the plant and offices were located. On the other hand, Gilbert, who was Bishop's secretary and represented the Bishop interest on the board of directors, lived in New York city, where Herring likewise was located. The actual control of the operations and business of the company rested in the hands of Curtiss alone. As Wheeler testified, " he [Curtiss] had full swing there." The evidence shows that Curtiss had difficulty in adjusting his attitude of mind and his conduct of affairs to the requirements of a corporate business which was not solely his own, as his old company had been, but was one in which others had rights and interests which he was bound to protect — a business in which his gains had to come through the gains of the company and not directly to himself. An early incident illustrates this attitude. Among the assets transferred to the plaintiff at its organization was a contract to build and demonstrate an aeroplane for the Aeronautical Society of New York. The contract price was $5,000. Some work had

been done on the motor when plaintiff took over the contract, but in the main the machine was constructed by plaintiff, delivered to the purchaser and the demonstration flights made by Curtiss. Even if we accept the findings made below, the purchaser paid Curtiss $4,500 in full settlement of the purchase price, together with $150 for certain repairs. The rebate of $500 was made without the authority or knowledge of the board of directors. The moneys so received by Curtiss were deposited by him in his own bank account, and some months later he paid to the plaintiff the arbitrary sum of $3,000, retaining the balance for himself. If, because his contract with the plaintiff did not require him to assume the dangers of flying, there was something to be said for his claim, it was clearly his duty to place the entire matter before the board of directors. It is no answer to say that by the payment of $3,000 the plaintiff made a fair profit on the transaction and that the criticism of it, therefore, reaches only to a question of profits. That misses the point altogether. Not only did he act, where because of his own interest he had no right to act, but he acted secretly by the dubious expedient of causing the $3,000 to be credited on plaintiff's books by his wife as and for a machine sold to him personally. A further illustration is found in the omission of Curtiss to turn over to plaintiff upwards of $3,000, which, before incorporation, had been paid to Curtiss as deposits by certain customers whose orders, however, were filled by plaintiff after its organization.

In the spring and early summer of 1909 the plaintiff built a second aeroplane for the purpose of competing in an international race meet in France for the James Gordon Bennett cup. The enterprise seems to have been undertaken on the suggestion of Bishop and to have been carried through with the knowledge and tacit approval of all the directors. Curtiss went abroad, made the flight, and won the cup, together with a considerable sum of money offered as a purse. At the suggestion of Bishop, who was present in Europe, Curtiss later competed in an Italian meet and was again successful, winning another substantial purse.

While Curtiss was thus absent, two events occurred which have a bearing upon the case. One was the discovery by Herring of the facts stated above in regard to the disposition of the moneys paid by the Aeronautical Society as well as of other moneys, including the deposits, which in his opinion belonged to the plaintiff. It is clear that these matters aroused suspicions and at least a latent hostility. The other was the commencement of a suit by Wright Brothers, manufacturers of aeroplanes, for an alleged infringement of their patents relating to a stabilizing device. The

suit was brought against both Curtiss individually and the plaintiff. The potential danger to plaintiff from the pendency of that suit is the one, and only, justification offered by defendants for subsequent acts which must otherwise render them liable to account.

In our opinion the use of the infringement suit as a justification is specious, and the findings made below, resting almost entirely on that basis, are against the weight of the credible evidence.

Curtiss returned to America about September 23, 1909. His European successes had aroused public interest and curiosity. The aeroplane itself was put on exhibition in New York and Boston for advertising purposes by concerns which paid plaintiff some thousands of dollars by way of rental. Thereafter Curtiss gave exhibition flights at various places, for which he received considerable sums of money, for which he did not account. Here was a new and fertile field of profit, the possibilities of which, unforeseen when plaintiff was organized, were quickly grasped by Curtiss. A consideration of all the relevant evidence brings an indelible conviction that Curtiss made up his mind to exploit that field for his own benefit. He proposed to capitalize his reputation. The precise plan by which that was subsequently accomplished was not at once formulated, but the purpose was. Immediately after his return, Curtiss got into touch with a newspaper and publicity man named Fanciulli with whom he discussed the exhibition business. He sought to enlist the services of Fanciulli in developing and operating that business.

The credibility of this witness is attacked in respondent's brief. Since his testimony was taken by deposition and read in evidence, we can deal with the question of credibility on a parity with the learned trial judge; and in any event, to do so is both our right and our duty. (*Matter of McMillan*, 218 N. Y. 64, 69.)

Fanciulli says Curtiss told him there was a tremendous demand from all over the country for exhibition flights, that he wanted to get started at once, and that he would have that part of the business in his own hands. But we are not entirely dependent upon Fanciulli's testimony. On October 4, 1909, ten days after his return from Europe, Curtiss wrote Fanciulli as follows: " I hope my message of today has had the desired effect. The fact of the matter is, this aeroplane business is assuming such stupendous proportions, especially in the way of exhibitions, that it seems to me worth organizing and going after."

The negotiations between the two men at that time contemplated Fanciulli's employment by the company for the purpose, primarily, of developing the exhibition end of the business. At that time Curtiss had in his own hands all the proceeds of the

European flights and of the exhibition flights made by him after his return to this country. Apparently it had not occurred to him that there might be objections to a continuation of the exhibition business on that basis. The objections, however, shortly manifested themselves. The situation was gone over by Curtiss with Wheeler and Baldwin at Hammondsport and under date of October 21, 1909, Curtiss wrote Fanciulli, saying: " I   *   *   * have talked with Mr. Wheeler and find it is not necessary to have a directors' meeting, but that Mr. Wheeler as President and myself as manager can engage you.   *   *   *   I shall look for you on the first train in Bath Saturday morning."

Fanciulli came as directed. On October twenty-third Fanciulli had a conference with Curtiss and Wheeler, in the course of which it was stated that arrangements would be made whereby Curtiss could conduct the exhibition business on his account separately from the company. Thereupon there was prepared and executed a written contract, witnessed by Wheeler, dated that day, whereby Curtiss individually employed Fanciulli " to manage the interests of the said Glenn H. Curtiss, party of the first part, said interests to include the sale, exhibition and exploitation of the Curtiss aeroplane, and any other business which the said Glenn H. Curtiss, party of the first part, may direct."

Two days later, on October 25, 1909, there was a directors' meeting held at Hammondsport attended by all the directors. No formal notice of the meeting had been given. Curtiss, Wheeler and Baldwin had arranged the meeting, and knew its purpose. How Gilbert happened to come does not appear. It does appear, however, that Bishop, whose interests Gilbert was supposed to represent, returned from Europe on October twenty-third, and knew nothing about the meeting or its purpose. Herring came in response to a note from Curtiss, which merely said: " If it is convenient, I think it would be a good plan for you to come up Sunday so that we can have a little directors' meeting. Mr. Gilbert is going to be here. Mr. Baldwin is now here and will stay over."

It is, therefore, clear that Herring had no notice of what was about to happen.

At that meeting a resolution prepared in advance thereof by Wheeler was adopted. The minutes of the meeting subsequently written up show that it was adopted unanimously. Herring insists that he did not vote for it. In view of his attitude toward Curtiss, and upon all the evidence, it is quite unlikely that the minute entry is correct, so far as Herring is concerned. Curtiss unquestionably voted for it, though he had no right to do so. The

resolution, which is too lengthy for insertion here, employs Glenn H. Curtiss as sole manager of the company with authority to designate an assistant manager and fix his compensation. It refers to the exhibition flights theretofore given, and provides that " all trophies, medals, prizes and compensation " which Curtiss had earned in the past should belong to him. It further provided that " in view of the fact that such exhibition flights are a valuable advertisement to the company, its business and products, and involve great risk to his life and limb," Curtiss " may engage in the business upon his own account and for his own benefit of making exhibition flights by himself or by any substitute or employee."

Under the authority of that resolution, Curtiss retained all the flight moneys theretofore received by him. Fanciulli at once began work under his contract with Curtiss, and for the next three years Curtiss as an individual, and through the Curtiss Exhibition Company which he later organized, carried on an extensive exhibition business, which earned large sums of money. The aeroplanes used by him and by other aviators employed by him belonged to the plaintiff, and for their use the plaintiff received nothing.

Within a few weeks after the passage of the October twenty-fifth resolution, Curtiss, Wheeler and Fanciulli, without any action by the board of directors, prepared and adopted for use in the business a form of aeroplane sales contract. That contract, among other provisions, contained a covenant by the purchaser that the aeroplane therein mentioned should not be used for public flights intended for amusement or advertising purposes or for any flights previously advertised, or in any contests or races, with certain exceptions. The necessary results of this restrictive covenant were greatly to reduce the manufacturing end of the business, and as a corollary, to limit competition with Curtiss' exhibition business. Fanciulli testifies that Curtiss said to him, while the proposed restrictive form of sales contract was under consideration, that " Charley Hamilton [an aviator] was about to go into the exhibition business, and either was or had been trying to arrange with Herring to get a Herring-Curtiss machine for those exhibitions. He said that if we were to make any money out of the exhibition business, it would be advisable to have a restrictive contract so that the market would not be flooded with aviators to make exhibitions."

A year or so later, when Curtiss' exhibition business was in full swing, we find him writing to Fanciulli to the same effect. " I cannot," he writes, " see much at present in the sales except to exhibitors. This would kill our exhibition business."

The reference above to Herring's attempt to secure an aeroplane for Hamilton relates, probably, to the so-called Arnold machine, the sale of which was made by Herring just before the restrictive contract was adopted. Three hundred dollars on account of the purchase price was paid in through Herring to the company. For various reasons Curtiss became suspicious of this transaction, sent back to Herring the $300, and although the balance of the purchase price of $4,000 was subsequently paid to the company, Curtiss refused to deliver the machine unless a restrictive contract was signed by the purchaser. A few weeks later Hamilton was under contract to fly for Curtiss.

The extent to which Curtiss was prepared to go in order to secure to himself the benefits of this profitable field is evidenced by another matter which may be referred to in this connection. Early in February, 1910, that is, within three or four months after the exhibition business was turned over to Curtiss, it became necessary, or at least from Curtiss' point of view, desirable, that the company should raise $10,000 to deposit with the surety company which had put up a bond on the appeal from a temporary injunction in the Wright infringement suit. The board of directors passed a resolution authorizing Curtiss to sell three of the aeroplanes then in his possession " at the best prices obtainable and apply the proceeds up to $10,000 to secure the American Surety Company upon its bond given in the suit in the United States Court of *Wright Brothers* v. *Herring-Curtiss Company and Curtiss,* and the surplus of such sales be turned over to such company."

Thereupon Curtiss, by means of a pretended sale to Hamilton, himself secretly bought the three machines for $10,000, a sum considerably less than their actual value. It may be noted in passing that there was no restrictive covenant exacted from the purchaser of these three machines.

One other bit of evidence is worth notice as disclosing Curtiss' attitude. For the sole purpose of preventing Herring, through his stock control, from dropping from the directorate Curtiss, Wheeler and Baldwin at the annual meeting to be held early in January, an action in Steuben county was brought in December against Herring to rescind the issue of stock to him on the ground of his failure to turn over to the company his patents and inventions. Therein a temporary injunction was granted. With this situation in mind, Curtiss suggestively warned Fanciulli, who was in Kansas City where Hamilton was making exhibition flights, as follows: " I want to call your attention to the fact that this Kansas City engagement is largely to demonstrate the machine to our prospective customers there. This matter of Hamilton's flights will probably

be brought up later in our differences with Herring, and I want it understood that all the exhibitions are largely for the interests of the company."

The resolution of October twenty-fifth must also be considered in the light of another probable motivation. The diverse personalities of Curtiss and Herring developed friction between them soon after organization. That appears in connection with the designing and building of the aeroplane which was to compete in Europe. While Curtiss was abroad he expressed to Bishop dissatisfaction with Herring and discontent with the extent of his stockholding, in view of the small value of what Herring had paid into the company. Immediately upon his return Curtiss learned of Herring's inquiries concerning the moneys received from the Aeronautical Societies and other moneys. He also learned that Herring had taken into his own possession certain stock which had been set aside for the purpose of raising working capital. On September twenty-seventh, four days after his return, Curtiss wrote Herring asking for a statement of that matter. None came. A reading of the evidence leaves no doubt that by October the breach between the two men was complete, and it is a fair inference that that situation, known to all of them, was talked over by Curtiss, Wheeler and Baldwin before action was taken on October twenty-fifth. There is evidence that soon after that meeting, Wheeler said there would be trouble from the resolution and a fight in connection with it. Three weeks later Bishop expressed a fear that his and his brother's investment of $37,000 would be sacrificed between the two conflicting interests. Curtiss wrote to him in reply that the only danger was " the probable change of management after March first next," and added: " There can absolutely be no patching up of this matter. It has got to go one way or the other. A temporary management means nothing without control. I must have control or get out." And the evidence shows that Wheeler read that letter.

In view of an inevitable struggle for control, it is not likely that Curtiss, Wheeler and Baldwin, in the course of their discussions before the adoption of the resolution of October twenty-fifth, lost sight of the fact that Herring, in the event of gaining control, would have to take the company divorced from its most profitable business — at least until it could be recovered as a result of protracted litigation.

A consideration of the evidence thus briefly outlined above would, in the absence of anything else, lead clearly to the conclusion that the motives behind the resolution of October twenty-fifth were purely selfish; that the resolution was, therefore, unwar-

ranted and was the cause of loss and damage to the plaintiff; and further that the adoption of the restrictive sales contract was in aid of the exhibition business and, while justified perhaps as a matter of business policy however weak the threat of the Wright suit, it was largely motivated, none the less, by an intent to limit competition in the exhibition field.

The court below, however, rejected the unworthy motives as an explanation and held in substance that the defendants, in turning over the exhibition business to Curtiss and in insisting upon the use of the restrictive sales contract, acted wisely and in good faith for the purpose solely of minimizing the dangers latent in the Wright infringement suit, while at the same time keeping before the public the name and reputation of the plaintiff.

The testimony of Curtiss and Baldwin, supported to some extent by the deposition of Wheeler, is, if considered apart from all other evidence, sufficient to warrant all but one part of the 35th finding of fact. That finding is to the effect that prior to the 25th of October, 1909, Curtiss, Wheeler and Baldwin conferred in regard to the condition of the plaintiff in view of the pendency of the Wright suit; that Wheeler suggested an entire suspension of the aeroplane business until the question of the injunction was determined; that Curtiss in reply said that if that were done the business would be ruined, and he offered to " undertake to carry on entirely at his own risk and expense the exhibition business, independently of the plaintiff herein, and assume all the risk, and relieve the plaintiff herein of all liability in connection therewith, pending the litigation over said injunction," and that Wheeler and Baldwin accepted the proposition and agreed to that course of action. The same evidence, similarly, is sufficient to warrant the 38th and 39th findings of fact.

There was and is no possibility of directly controverting the evidence of the only three men who were present during the conferences. But we must consider the credibility of that testimony in view of other evidence.

The Wright Brothers began two actions for infringement in August, 1909, while Curtiss was abroad. One action was against the plaintiff and Curtiss; the other against the Aeronautical Society, which had purchased the first machine turned out. The action was not unexpected. The claims of the Wrights had been known for months; as early as May fourth, Bishop, who was then in Europe and in personal contact with the Wrights, wrote about the matter. At that time he was impressed with its seriousness, and said that he would furnish no money with which to contest the

8

suit.   His opinion then was based solely on the *ex parte* statements of the Wrights themselves, and caused no great uneasiness to the people in Hammondsport.   And that was particularly true of Curtiss.   The following facts seem to me to cast serious doubt on the claim that the threat of the Wright suit alone swayed the action of the director defendants.

1.  Curtiss himself never regarded the Wright suit as dangerous. Under date of September third he wrote from Europe, " Everyone here thinks Wrights' suit is only a bluff.   No one thinks there is any infringement.   I saw Sir Hiram, Santos, & the whole ' bunch.' Bleriot & Latham both use warping wings."

Wheeler testifies that Curtiss told him he thought he was right in regard to the suit and was willing to fly and take his chances. Even after the temporary injunction had been granted Curtiss wrote to Bishop as follows: " In regard to the patent situation, will say that I have more confidence every day as to the decision in the Court of Appeals, and absolutely no concern about the final decision on the trial."

Perhaps the best commentary on his state of mind is the fact that he was ready and willing to take over the exhibition business, and thereby expose himself to whatever danger there was.

2.  As to Baldwin, he was engaged at that very time in building at Hammondsport a machine for himself with which he intended to and did go into the exhibition business.   The threat of the Wrights worried him not at all.

3. The resolution itself does not recite the threat of the Wright action as a reason for turning over the exhibition business to Curtiss.   If that had been the thought then in the minds of Curtiss, Wheeler and Baldwin, there is no reason why it should not have been recited, and every reason why it should have been. The only answer made to this criticism is that they did not want to spread on the record anything which the Wrights could get hold of and use against them in court.   That answer is not convincing. If, as respondents claim, the turning over of the exhibition business to Curtiss relieved the company of liability, then the recital in the resolution of the real reason would have helped rather than hindered the company in the Wright action.

4. There is no claim made and no evidence to show that at the meeting of the directors on October twenty-fifth, when the resolution was passed, anybody during the discussion suggested the pendency of the Wright suit as a reason for adopting it.   And that is strange if it was then the controlling thought in the minds of the directors.

5. When the defendants came to answer in this case, they did

not even then attempt to justify the resolution upon the ground of the Wright suit. On the contrary, the answer justifies the resolution as being wise and fair to the stockholders, because " had not such a resolution been adopted by said Board of Directors allowing defendant Glenn H. Curtiss to fly as an aviator and receive the proceeds of such flights, he would not have flown, and, therefore, the plaintiff would not have received the valuable advertisement which it did by reason of his making flights from time to time."

6. The transfer of the exhibition business to Curtiss did not, as matter of law, relieve the company from liability.

The evidence plainly shows that both Wheeler and Curtiss knew what the law of the subject was. Curtiss, testifying with reference to the reasons for adopting the restrictive contract, says: " We wanted to limit our liability under that guaranty to the manufacture and sale of machines, and not permit their being used in such a way that the Wrights would have a case for damages sustained by them because of our manufacture and the sale of machines for exhibition purposes." He knew that if the company sold a machine for exhibition purposes, it would be liable for damages. He must have known that if the plaintiff turned over to him, not by sale but by a temporary loan, machines used for exhibition purposes, it would similarly be liable for damages.

But it is said that Curtiss, as part of his agreement with the plaintiff, concerning the exhibition business, agreed to indemnify the plaintiff from any liability. The language of finding of fact 35 is that he " would undertake and carry on entirely at his own risk and expense the exhibition business, independently of the plaintiff herein, and assume all the risk, and *relieve the plaintiff herein from all liability in connection therewith,* pending the litigation over said injunction."

To this it may be answered that if Curtiss had made any such agreement of indemnity with the company, it might very well have been in writing, and preferably in the resolution itself. There is no written evidence of any such agreement. Moreover, the evidence tending to show such a verbal agreement by him is insufficient. Curtiss' testimony is as follows: " I told Judge Wheeler and the others that I was willing to take those risks personally, and that * * * I was willing to go on and continue to do that flying on my own responsibility."

Baldwin's testimony is as follows: " I said * * * that if Mr. Curtiss wished, he could assume the responsibility and carry it on."

Wheeler's testimony is as follows: " Mr. Curtiss said in that

respect he would take his chances, both as to the risk of flying the machines and the consequences of the injunction business. I thought if he did that, it would be a personal matter with him."

If the plaintiff had ever sought indemnity from Curtiss under any such loose statements, obviously it would have failed.

Our conclusion is, then, that the finding of the trial court that the resolution of October 25, 1909, so far as it dealt with the future exhibition business, was motivated by the threat of the Wright suit, is against the weight of the evidence. Likewise the finding that the restrictive sales contract was similarly motivated, is also against the weight of the evidence, when considered in connection with the resolution. It follows that those acts of the directors were wrongful.

If we are right in that conclusion, then we are bound to consider the subsequent acts, not each by itself as a separate transaction, but in the light of the fraud already committed, and in the light of all surrounding circumstances as the battle for control between Curtiss and Herring progressed. We, therefore, deal with some of them as briefly as may be from that point of view.

In the summer of 1909, Curtiss and a man by the name of Waters, who had been carrying on a small business in making and assembling motorcycles, incorporated the Marvel Motor Cycle Company. Curtiss put up $7,500, took one-fourth of the capital stock, and became the president and a director of the company. On August 3, 1909, at the instance of Curtiss the plaintiff sold a piece of land to the new company, and helped to finance thereon the erection of a factory building. Wheeler and Baldwin knew all about the matter; Curtiss told Herring merely that he was acting as one of the incorporators and directors, leaving the impression that he was only interested in establishing an industry which would purchase from plaintiff a considerable portion of its manufacturing material.

Early in December, 1909, the struggle for control was well under way. Curtiss already had in his hands the exhibition business, which as things then stood was the only part of the aeroplane business which was making money. The restrictive sales contract had put an end for the time being to the manufacture of aeroplanes on any considerable scale. If at the annual meeting to be held a month hence, Herring was to get control, there was left the motorcycle end of the business, which conceivably might enable the plaintiff to maintain itself until the new management could recapture and develop the aeroplane business. In this situation Curtiss caused a contract to be made between the plaintiff, of which he was vice-president, director and general manager, and

the Marvel Company, of which he was president and director, by the terms of which plaintiff was bound to furnish 500 motors at a figure which, in spite of Curtiss' testimony to the contrary, was clearly very low.

After that contract was made, Curtiss was then in this position: If Herring got the business, he got it saddled with a heavy and unprofitable contract in favor of a rival. If Curtiss got the business, then there was no danger from that contract because he dominated the Marvel Company.

With a hold on every branch of the company's business, Curtiss was in shape to come to grips with Herring. Two weeks after that contract was made, the company, through a firm of lawyers in New York city, began an equity action in Steuben county to rescind the issue of stock to Herring upon the ground that he had failed to turn over to the plaintiff his patents and inventions. A preliminary injunction was granted restraining Herring from transferring any of his stock, and a short time afterwards another order was granted which broadened the injunction so as to prevent his voting the stock at the annual meeting. Herring was completely tied up, and from that time on had nothing to do with the conduct of the business.

We are constrained to believe that the Marvel Company contract was improvidently made; that Curtiss, in making it, was not only acting for his own personal benefit, but also was acting with the ulterior design of injury to the plaintiff if his rival should gain control of it. Wheeler and Baldwin were privies to the transaction and knowingly aided in carrying it through.

Early in December, Herring had sent out a letter to the officers and directors of the company, protesting against the resolution of October twenty-fifth, against the entry in the minutes recording his vote in favor of the resolution, against the restrictive con tract, and generally against the acts of the director defendants. Immediately Bishop wrote to Curtiss, calling upon him for an explanation of the matters referred to in Herring's letter and of other matters. It was evident to the director defendants that Herring was about to take overt action of some sort. Thereupon Fanciulli and Curtiss went to New York and consulted counsel. The possibilities of meeting Herring's threatened attack by a counter attack were discussed. Fanciulli says that a bankruptcy proceeding was mentioned, among other things. That, however, is doubtful. Pretty clearly the company was entirely solvent at that time. The plan agreed upon was to begin the action in Steuben county above referred to. The summons and complaint were prepared, together with affidavits upon an application for a

preliminary injunction. A meeting of the directors was called for December eighteenth to authorize the action. The injunction order was obtained the same day. The respondents argue in their brief here that the action was brought in good faith and solely for the best interests of the plaintiff. The opinion below says that the evidence does not sustain the claim that the purpose of the action was to freeze out Herring. Nevertheless, it is found as a fact that the purpose of the action " was to prevent Herring from coming into control." The distinction between the two things is not very clear.

While Curtiss, Wheeler and Baldwin had been in substantial control from the very beginning, the others, particularly Herring, had access to the books, papers and records of the company, and an opportunity, at least, to be heard in connection with the conduct of its business. From the eighteenth of December, however, the company was absolutely in the hands of the director defendants. Shortly thereafter Herring, as a stockholder, brought a counter action against them in New York, charging fraud substantially as in the present action.

As stated above, the company at this time was unquestionably solvent. The annual report of the company to the State Comptroller, verified by Curtiss on the tenth day of December, and purporting to show its condition as of October thirty-first, disclosed assets of $64,000 and liabilities of $20,000, consisting of the $15,000 mortgage, and $5,000 of accounts payable. It had not been necessary down to December eighteenth to borrow, and no loans had been made for use in the business. As late as January 31, 1910, Wheeler, in a letter to their counsel in New York, in reply to a letter from them suggesting that bankruptcy would be the most satisfactory method of winding up the affairs of the company, said: " I am satisfied that the company is solvent, both within the meaning of the State law and the bankruptcy law, and that it has not yet committed an act of bankruptcy."

It is true that moneys had been expended and indebtedness contracted for new buildings and improvements, for raw material, and particularly for motorcycle parts in connection with the Marvel Company contract. In the case of a going concern, these liabilities were offset by the corresponding increase in the value of the assets.

In the latter part of November, 1909, the Standard Audit Company, which had made the inventory and opened the corporate books at the time of the organization of the company, brought an action in the City Court of New York to recover the value of its services. Curtiss, Wheeler and Baldwin were not disposed to pay it, because they said that was Herring's business. An answer was

interposed and the case hung fire until the middle of March following.

Meanwhile, various negotiations were had between Curtiss, Wheeler and Baldwin on the one hand and Herring on the other, looking toward the elimination of one or the other of the two factions. Coupled with these negotiations were suggestions and offers on the part of Bishop aimed to reach some solution which would save his investment. The details need not be gone into. They were all abortive, because the Curtiss faction was determined upon ousting Herring without payment to him of any substantial sum. Bishop's suggestion of a voting trust was turned down because it involved the continued connection of Herring in the enterprise.

As these negotiations proceeded, the threat of possible bankruptcy came to be used as a lever. At any time after the first of January, the Standard Audit claim could have been settled for $500. During that period many other claims less importunate were paid. Finally, about the middle of March, the Standard Audit claim was deliberately permitted to go to judgment. Execution was issued, and thereupon on the basis of that act of bankruptcy and of the alleged insolvency of the company, a petition in bankruptcy was filed by the Bank of Hammondsport and two other small creditors living in Hammondsport. A man by the name of Parkhurst was appointed receiver. The appraisers in bankruptcy, all friendly to the Curtiss faction, made an inventory which on its face disclosed insolvency.

It is unnecessary to pursue the details of the bankruptcy proceeding. Herring, after various attempts, succeeded, eventually, in his capacity as a creditor, in contesting the allegations of the bankruptcy petition. The matter was referred to the referee in bankruptcy in Steuben county, as special master. Although the essential issues in the bankruptcy case were merely the questions of whether an act of bankruptcy had been committed, and whether or not plaintiff was insolvent, the trial before the special master took a wide collateral range and resulted on these collateral matters in a report favoring the contentions of the Curtiss faction. Parkhurst, as receiver, carried along the business with what seems to have been ordinary good management, and was subsequently elected trustee. Under a resolution of the creditors, but without any order of the bankruptcy court, Parkhurst was substituted as plaintiff in the Herring action, as well as in the plaintiff's action against Herring. Nothing was ever done thereafter in either of those actions. The plant was sold at auction and bid in by Curtiss. Subsequently the trustee sold to Wheeler the good will, the trade-

marks, patents, claims and applications therefor for five dollars, and certain accounts and debts for ten dollars. It may be added that the Marvel Motor Cycle plant subsequently came back into the hands of Curtiss.

Our conclusion as to all of the matters thus briefly alluded to, being the acts of the director defendants subsequent to December 18, 1909, which resulted in the diversion of all of the property and assets of the company to Curtiss and ultimately to companies organized by him, in which he was the principal stockholder and in which Wheeler and Baldwin were interested, is that Curtiss, Wheeler and Baldwin acted selfishly and in their own interest, and hence wrongfully and in breach of their duties as directors.

We are not disposed to believe, as appellants contend, that during the conferences between the director defendants preceding the resolution of October 25, 1909, a conspiracy in the sense of a complete and premediated plan to wreck the plaintiff was entered into. It is quite probable that at that time there was no thought of ultimate injury to Bishop and his friends, who had financed the organization. On the other hand, it is entirely clear that the director defendants, and particularly Curtiss, had early made up their minds that Herring was not so valuable as they had at first supposed him to be, and felt aggrieved that he had acquired controlling stock interest without any substantial consideration. That their own stock holding was of the same nature was lost sight of. Moved by a desire to take the profits of the exhibition business themselves, and at the same time to entrench themselves against Herring, they planned to and did adopt the resolution of October twenty-fifth, which within a couple of weeks was fortified by the adoption of the restrictive form of contract. Thereafter the exigencies of the struggle for control led them to lose sight entirely of the interest of the only stockholders who had contributed actual capital to the enterprise. Both on the trial and in the argument here the case took on the aspect of a struggle between Herring on one side and the three director defendants on the other. With that phase of the case we are not interested. Whether Herring was blameworthy or not is not the issue. The assumed necessities of a fight for control offer no excuse for a breach of fiduciary duties. We think these director defendants acted solely in their own interests, and that for the benefits derived by them at the expense of the plaintiff, they should be held liable.

A word may be said concerning the right of the plaintiff to maintain this action. As stated above, in December, 1909, an action was brought in New York county by Herring as a stockholder on behalf of himself and others against Curtiss, Wheeler and

Baldwin, charging fraud based on the resolution of October twenty-fifth, and other matters so far as they existed at the time the action was begun. The bankruptcy petition was filed March 31, 1910, and an adjudication was made November 18, 1910. At a meeting of creditors held December 2, 1910, a resolution was passed authorizing Parkhurst as trustee to retain one Marvin as attorney to prosecute the Herring action. Marvin had been of counsel to Herring. He was not selected by Parkhurst, he was not friendly to Parkhurst, and there was never any co-operation between the client and the attorney. Nothing was done for a year. Then, without any order of the bankruptcy court authorizing it, Marvin, on behalf of Parkhurst as trustee, made application to the State court to have Parkhurst substituted for Herring as plaintiff, and an order to that effect was made on December 27, 1911.

An amended and supplemental complaint was made and served which still later in 1914 was again amended, and answers were interposed. Substantially nothing further was ever done in the prosecution of the action. Parkhurst in 1912, 1914 and 1916 made applications to the bankruptcy court for leave to discontinue the New York action. In those petitions Parkhurst asserted that from facts in his possession he thought ultimate recovery of any judgment was doubtful, and that he believed further prosecution of the action could only result in the expenditure of the small sum remaining in his hands without any benefit to the creditors of the bankrupt. At the date of the last application he stated that he had $976.30 on hand which might be distributed to the creditors, but which he feared would be consumed in a fruitless litigation. Upon the last application made in 1916, the order denied an allowance asked for by Marvin of $250 on account of his services and expenses, and then postponed the motion of the trustee for leave to discontinue. So far as the record shows nothing further was ever done in the matter by the bankruptcy court. Thereafter three years elapsed before the present action was begun. A lapse of nine years with nothing done by the trustee in bankruptcy to forward the litigation except the procurement of an order of substitution and the service of an amended complaint, which was never verified by the trustee because as he stated he did not believe there was any cause of action, and could not conscientiously swear to the allegations therein contained, coupled with three applications for leave to discontinue, in each of which the trustee stated under oath that there was no substantial basis for the action, and that its discontinuance would be for the benefit of the estate, afford, to our minds, sufficient basis for a finding that the prosecution was abandoned. The fact that there was not in 1916 and is not now

in the possession of the bankrupt estate any adequate sum to pay the expenses of such litigation, adds emphasis to that conclusion. We think the facts show not only an intentional but a necessary abandonment of the right to continue prosecution of the New York action, thus leaving open the right to the bankrupt to proceed as it has in this case, with the trustee a party and so in a position to claim the fruits of the action in the event of success, so far, at least, as to satisfy in full the claims of all creditors. (Cf. *Johnson* v. *Collier*, 222 U. S. 538.)

The judgment below, so far as the defendants Curtiss, Wheeler and Baldwin are concerned, should be reversed. Certain findings of fact and conclusions of law are disapproved and reversed and certain new findings of fact and conclusions of law are made; and, to the end that this court may enter final judgment, with costs, a reference should be directed to fix the amount which the plaintiff is entitled to recover under the determination made by this court. Judgment as to the other defendants should be affirmed, with separate bills of costs to each of said defendants appearing upon this appeal and filing separate briefs.

The appeal from the order permitting the amendment *nunc pro tunc* of plaintiff's requested finding of fact No. 698 should be dismissed, since we now find as requested.

The appeal from the order granting an extra allowance should be affirmed.

All concur. Present — HUBBS, P. J., CLARK, SEARS, CROUCH and TAYLOR, JJ.

Judgment as to the defendants directors reversed on the facts, certain findings of fact and conclusions of law disapproved and reversed, new findings of fact and conclusions of law made, and, to the end that this court may enter final judgment, with costs, a reference is hereby directed to fix the amount which the plaintiff is entitled to recover under the determination made by this court. Judgment as to the other defendants affirmed, with separate bills of costs to each of said defendants appearing upon this appeal and filing separate briefs.

Settle order before Mr. Justice CROUCH, on two days' notice.

Appeal from order amending finding dismissed.

Order granting an additional allowance of costs affirmed, with ten dollars costs and disbursements.